RONALD O. KAYE, SBN 145051
Email: rok@kmbllaw.com
CAITLIN WEISBERG, SBN 262779
E-mail: cweisberg@kmbllaw.com
KAYE, McLANE, BEDNARSKI & LITT, LLP
975 East Green Street
Pasadena, California 91106
Tel: (626) 844-7660
Fax: (626) 844-7670

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALEX AGUILAR, JR., and P.A., by and through her Guardian Ad Litem, Florence Ahumada, AND THE ESTATE OF ALEX AGUILAR, SR.,<br><br>   Plaintiffs,<br><br>v.<br><br>CITY OF LOS ANGELES, ET AL.,<br><br>   Defendants. | CASE NO. 17-04382-CBM (MRWx)<br><br>[HONORABLE CONSUELO B. MARSHALL]<br><br>**PLAINTIFFS' MOTION IN LIMINE NO. 2 TO EXCLUDE CERTAIN EXPERT OPINIONS BY DEFENSE EXPERTS VILKE AND KROLL**<br><br>[*Filed concurrently with Declaration of Ronald O. Kaye and Exhibits; Declaration of Caitlin S. Weisberg and Exhibits*]<br><br>Date: October 2, 2018<br>Time: 2:30 p.m.<br>Ctrm: 8B |

1  TO THE HONORABLE COURT, ALL PARTIES HEREIN AND THEIR
2  RESPECTIVE ATTORNEYS OF RECORD:

3       Plaintiffs, by and through counsel of record, respectfully submit this Motion
4  *in Limine* No. 2 To Exclude Certain Expert Opinions by Defense Experts Vilke and
5  Kroll.

6       This motion is made following a meet and confer with opposing counsel as
7  required by Local Rule 7-3. The meet and confer took place on August 21, 2018.

8       Plaintiffs' Motion is based on the attached Memorandum of Points and
9  Authorities, the Declaration of Ronald O. Kaye and exhibits thereto, the
10 Declaration of Caitlin S. Weisberg and exhibits thereto, all pleadings and papers on
11 file in this action, and such other evidence and argument as may be presented on
12 behalf of Plaintiffs at the hearing on the motion.

13                 Respectfully Submitted,

14

15                 Kaye, McLane, Bednarski & Litt, LLP

16 DATED: September 4, 2018     By:   */s/ Caitlin S. Weisberg*
17                 Ronald O. Kaye
18                 Caitlin S. Weisberg
                  Attorneys for Plaintiffs

19

20

21

22

23

24

25

26

27

28

# <u>TABLE OF CONTENTS</u>

I.   INTRODUCTION & FACTUAL BACKGROUND ....................................... 1

II.  LEGAL STANDARD ......................................................................... 2

III. ARGUMENT ................................................................................... 4

    A.   Defense Expert Gary Vilke (Medical) ....................................... 4

        1.   Dr. Vilke's Opinion and Purported Factual Basis ................... 5

        2.   Dr. Vilke Is Not Qualified to Opine on Mr. Aguilar's
            Toxicology or the Physiological Effects of the Substances in
            Mr. Aguilar's System ....................................................... 7

        3.   Opinion No. 4 Is Not the Proper Subject of Expert Testimony
            Because It Is Not Based on "Scientific, Technical, or Other
            Specialized Knowledge [that] Will Help the Trier of Fact." ...... 8

        4.   Dr. Vilke's Opinion No. 4 Is Inadmissible Because He Fails to
            Reliably Apply "Reliable Principles and Methods" to the Facts
            of This Case. ................................................................. 10

        5.   Dr. Vilke's Opinion No. 4 Is Not Relevant To Any Claim or
            Defense At Issue in the Case and Is Therefore Inadmissible
            Under Federal Rules of Evidence 401/402 and 403. ............... 11

    B.   Defense Expert Mark Kroll (Taser / Bioelectricity) .................... 12

        1.   Mr. Kroll's Opinion and Purported Factual Basis ................. 13

        2.   Mr. Kroll Is Not Qualified to Opine on Mr. Aguilar's
            Toxicology or the Analgesic Effects of the Substances in Mr.
            Aguilar's System ........................................................... 14

         3.   Mr. Kroll's Opinion No. 6 Is Not Based on Sufficient Facts or
            Data, Much Less Reliable Principles and Methods that Were
            Applied Reliably to the Facts of this Case. .......................... 19

        4.   Mr. Kroll's opinion should be excluded because the studies he
            cites are irrelevant to the facts of this case and would not assist
            a jury. ......................................................................... 20

i

a.      Methamphetamine / Amphetamine ..............................21

b.      Alcohol ........................................................................22

c.      Morphine / Heroin ......................................................23

5.      Mr. Kroll's Unfounded Opinions Cannot Be Cured by Further Research, in Violation of the Disclosure Requirements of Fed. R. Civ. P. 26(a)(2). ...................................................................23

IV.   CONCLUSION ...........................................................................25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Barabin v. AstenJohnson, Inc.*,
700 F.3d 428 (9th Cir. 2012).................................................................. 10, 20

*Bell v. Swift Adhesives, Inc., a div. of Reichhold Chemicals, Inc.*,
804 F. Supp. 1577 (S.D. Ga. 1992) ................................................... 21

*Cabrera v. Cordis Corp.*,
134 F.3d 1418 (9th Cir. 1998)............................................................ 20

*ClearOne Commc'ns, Inc. v. Biamp Sys.*,
653 F.3d 1163 (10th Cir. 2011) ......................................................... 24

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
43 F.3d 1311 (9th Cir.1995).......................................................... 2, 12

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993) ................................................................*passim*

*Goebel v. Denver & Rio Grande W. R.R. Co.*,
215 F.3d 1083 (10th Cir. 2000) .......................................................... 4

*Hangarter v. Provident Life & Accident Ins. Co.*,
373 F.3d 998 (9th Cir. 2004)............................................................... 3

*Higgins v. Koch Development Corp.*,
997 F. Supp. 2d 924 (S.D. Ind. 2014) ................................................ 7

*Hollander v. Sandoz Pharm. Corp.*,
95 F. Supp. 2d 1230 (W.D. Okla. 2000), *aff'd in part and
remanded*, 289 F.3d 1193 (10th Cir. 2002)................................. 21, 22

*Hubbard v. Rite Aid Corp.*,
433 F. Supp. 2d 1150 (S.D. Cal. 2006) ............................................... 9

*Jones v. Lincoln Elec. Co.*,
188 F.3d 709 (7th Cir. 1999) ......................................................... 7, 18

iii

*Lust v. Merrell Dow Pharmaceuticals, Inc.*,
  89 F.3d 594 (9th Cir.1996) ............................................................. 2

*McClain v. Metabolife Int'l, Inc.*,
  401 F.3d 1233 (11th Cir. 2005) ........................................... 19, 20, 21

*McDowell v. Brown*,
  392 F.3d 1283 (11th Cir. 2004) ................................................... 9, 10

*Reger v. A.I. DuPont Hosp. for Children of Nemours Foundation*,
  259 Fed. App'x 499 (3d Cir. 2008) ............................................. 3, 20

*Reger v. A.I. DuPont Hosp. for Children of Nemours Foundation*,
  259 Fed.Appx. 499 (3d Cir. 2008) ................................................... 11

*Smelser v. Norfolk Southern Ry. Co.*,
  105 F.3d 299 (6th Cir.1997) ............................................................. 3

*Summers v. Missouri Pacific R.R. System*,
  897 F. Supp. 533 (E.D. Okla. 1995), *aff'd*, 132 F.3d 599 (10th Cir.
  1997) ........................................................................................... 18

*U.S. v. Scholl*,
  166 F.3d 964 (9th Cir. 1999) ................................................... 11, 20

*United States v. Finley*,
  301 F.3d 1000 (9th Cir. 2002) .......................................................... 3

*United States v. Frazier*,
  387 F.3d 1244 (11th Cir. 2004) ........................................................ 3

*United States v. Vallejo*,
  237 F.3d 1008, *opinion amended on denial of reh'g*, 246 F.3d 1150
  (9th Cir. 2001) ............................................................................... 9

*Wade-Greaux v. Whitehall Laboratories, Inc.*,
  874 F. Supp. 1441 (D.V.I. 1994), *aff'd*, 46 F.3d 1120 (3d Cir.
  1994) ........................................................................................... 21

*Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*,
  254 F.3d 706 (8th Cir. 2001) ........................................................... 4

*Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*,
  259 F.3d 1101 (9th Cir. 2001) ................................................. 24, 25

iv

**Statutes**

Health and Safety Code § 11550 ................................................................. 8

**Other Authorities**

Federal Rule of Civil Procedure 26 ...................................................... 24, 25

Federal Rule of Civil Procedure 37 .......................................................... 24

Federal Rule of Evidence 702 ............................................................ *passim*

Federal Rules of Evidence 401 ..................................................... 5, 11, 12

Federal Rules of Evidence 402 ..................................................... 5, 11, 12

Federal Rules of Evidence 403 ..................................................... 5, 11, 12

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION & FACTUAL BACKGROUND

On June 9, 2016, Alex Aguilar was taken into the custody of the Los Angeles Police Department ("LAPD") and transported to Harbor station. At the station, Defendants Medina and Melero initiated a strip search. During the search, Defendants observed Mr. Aguilar place what they suspected to be a bindle of narcotics in his mouth and responded by using force. Hands-on attempts to control Mr. Aguilar quickly escalated to five separate applications of Defendant Medina's Taser and three head strikes by Defendant Melero over a period of less than a minute. The use of force caused the bindle to lodge in Mr. Aguilar's throat, preventing him from breathing and resulting in unconsciousness (shortly after the head strikes).

When they noticed that Mr. Aguilar was unconscious, Defendants began chest compressions and called for a rescue ambulance. However, they did not follow standard protocol and training for airway obstructions, which directs first responders to visualize the obstructed airway and, if possible, remove the object with a finger sweep.

As a result of defendants' use of force and unreasonable / deliberately indifferent response to Mr. Aguilar's serious medical condition, Mr. Aguilar died. The autopsy confirmed death by asphyxiation.

Defendants have disclosed several experts, including: (1) Mark Kroll, a bioelectricity/Taser expert; and (4) Gary Vilke, a medical expert. Mr. Kroll and Dr. Vilke have offered opinions regarding the drugs in Mr. Aguilar's system at the time of his death that are, for the reasons argued in this motion, inadmissible under the Federal Rules of Evidence and Federal Rules of Civil Procedure. The opinions sought to be excluded in this motion are as follows:

A.   Gary Vilke

- Opinion #4: "The drugs that Mr. Aguilar had in his system,

including methamphetamine and heroin, likely caused him to act in an irrational and impulsive manner, contributing to his death."

Vilke Report (Ex. I) at 4, 9-10.[1]

B.   Mark Kroll

- Opinion #6: "Due to the presence of multiple analgesic drugs, Mr. Aguilar felt zero to minimal pain from the drive (contact or touch)-stuns." Kroll Report (Ex. M) at 8, 18, 19-20, 26.

These opinions refer to the toxicology results of the autopsy on Mr. Aguilar which state that Mr. Aguilar had alcohol (BAC .071), methamphetamine (330 nanograms/mL) and morphine/heroine (.03 micrograms/mL) in his bloodstream. Vilke Depo. (Ex. L) at 103:20-104:10; Kaye Decl. ¶ 4.

## II.   LEGAL STANDARD

The admissibility of expert testimony is governed by FRE 702. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590 (1993). The proponent of the expert testimony bears the burden of proving admissibility. *Lust v. Merrell Dow Pharmaceuticals, Inc.*, 89 F.3d 594, 598 (9th Cir.1996); *see also Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1316 (9th Cir.1995) ("the party presenting the expert must show that the expert's findings are based on sound science").

In *Daubert*, the Court held that a "trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589; *See Kumho Tire Co.,* 526 U.S. at 147 (extending *Daubert*'s requirements of relevance and reliability to non-scientific testimony). To establish relevance, the testimony must be helpful to the trier of fact and beyond the common knowledge of jurors. Fed. R. Evid. 702; *Daubert*, 509 U.S. at

---

[1] Unless otherwise noted, the documents and evidence cited in this motion are attached as exhibits to the Declaration of Ronald O. Kaye In Support of Plaintiffs' Motions *in Limine* (Dkt. No. 115).

597.

The trial court acts as the gatekeeper to ensure reliability when applying the *Daubert* factors in scientific and police practice testimony. *Hangarter v. Provident Life & Accident Ins. Co.,* 373 F.3d 998, 1017-18 (9th Cir. 2004). Evidence is admissible under *Daubert* if: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert;* and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. *See* Fed. R. Evid. 702; *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (citing *Daubert,* 509 U.S. at 589).

To establish reliability, the testimony must be derived from valid scientific or specialized knowledge, the witness must possess sufficient expertise, and the state of pertinent scientific or specialized knowledge must permit the assertion of a reasonable opinion. *United States v. Finley*, 301 F.3d 1000, 1007 (9th Cir. 2002). Testimony is grounded in valid knowledge if it is "based on the methods and procedures of science [or other expertise] rather than on subjective belief or unsupported speculation; the expert must have good grounds for his or her belief." *Reger v. A.I. DuPont Hosp. for Children of Nemours Foundation*, 259 Fed. App'x 499, 500 (3d Cir. 2008) (quoting *Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003) and *Daubert*, 509 U.S. at 590).

Assessment of the expert's qualifications to testify is not answered in the abstract but based on whether the expert's "qualifications provide a foundation for a witness to answer a specific question." *Smelser v. Norfolk Southern Ry. Co.,* 105 F.3d 299, 303 (6th Cir.1997) (internal quotations omitted). "The trial court must determine whether the expert's training and qualifications relate to the [specific] subject matter of his proposed testimony." *Id.* A district court "must continue to perform its gatekeeping role by ensuring that the actual testimony does not exceed

the scope of the expert's expertise, which if not done can render testimony unreliable under Rule 702." *Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d 706, 715 (8th Cir. 2001) (concluding that hydrologist was qualified to testify about flood-risk management but not about safe warehousing practices).

A district court may satisfy its so-called "gatekeeping" function by conducting a pretrial hearing, or by ruling on a Rule 702 objection at trial, "so long as the court has sufficient evidence to perform 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *Goebel v. Denver & Rio Grande W. R.R. Co.,* 215 F.3d 1083, 1087 (10th Cir. 2000) (quoting *Daubert,* 509 U.S. at 597). Although "the gatekeeper inquiry under Rule 702 is ultimately a flexible determination, . . . a district court, when faced with a party's objection, must adequately demonstrate by specific findings on the record that it has performed its duty as gatekeeper." *Id.* at 1088 (citation omitted).

## III.   ARGUMENT

### A.   Defense Expert Gary Vilke (Medical)

According to his report, Defendants' medical expert, Dr. Gary Vilke, is a "board-certified emergency department physician with substantial experience in sudden cardiac arrest and sudden cardiac death, as well as in-custody death" and is "an independent researcher on the physiologic effects of TASER Electronic Control Devices (ECDs) on humans." Vilke Report (Ex. I) at 1. Dr. Vilke offers four opinions in his initial expert report and three rebuttal opinions to Plaintiffs' experts. Vilke Report (Ex. I) at 4; Vilke Rebuttal Report (Ex. K) at 2.

The fourth opinion in Dr. Vilke's initial report is the subject of this motion *in limine*: "4. The drugs that Mr. Aguilar had in his system, including methamphetamine and heroin, likely caused him to act in an irrational and impulsive manner, contributing to his death." Vilke Report (Ex. I) at 4, 9-10. For the reasons stated in Plaintiffs Motion in Limine No. 1 (to exclude bad acts), the

existence of drugs in Mr. Aguilar's system is irrelevant or minimally relevant and unfairly prejudicial and therefore should be excluded under Federal Rules of Evidence 401/402 and 403. If the court grants that portion of Plaintiffs' Motion *in Limine* No. 1, then this argument is moot. Even if that motion is denied, however, Dr. Vilke's Opinion No. 4 should be excluded under Federal Rule of Evidence 702 because: (1) Dr. Vilke is not a toxicology expert and is otherwise unqualified to opine on the specific effect of the drugs in Mr. Aguilar's system; (2) the opinion is not based on Dr. Vilke's scientific, technical, or other specialized knowledge and therefore will not assist the jury in understanding the evidence or determining the facts, and (3) the testimony is not the product of reliable principles and methods applied reliably in this case.

### 1.      Dr. Vilke's Opinion and Purported Factual Basis

The entirety of Dr. Vilke's Opinion No. 4 states:

> 4.   The drugs that Mr. Aguilar had in his system, including methamphetamine and heroin, likely caused him to act in an irrational and impulsive manner, contributing to his death.
>
> On autopsy, Mr. Aguilar was found to have methamphetamine as well as heroin in his bloodstream. These illicit drugs commonly cause people to act in [an] irrational and often impulsive manner. They can cause agitation and result in people doing behaviors that they might not otherwise normally do. Mr. Aguilar stuffed a baggy of drugs down his throat despite the fact that a rational person would likely realize it was too large to easily swallow. And despite being unable to swallow the baggy, he would not spit it out as ordered by the officers. The drugs in his system likely were altering his ability to think and function rationally and clearly and likely contributed to his decision not to spit out the baggy, thus contributing to his death by asphyxiation.

Vilke Report (Ex. I) at 9-10.

Dr. Vilke's opinion does not purport to analyze the substances in Mr. Aguilar's system or provide data or information on how the levels of those substances correspond to the amount of drugs consumed by Mr. Aguilar or the

level of intoxication that would result from the concentrations in Mr. Aguilar's bloodstream:

> Q: Okay. Now, you're not a certified toxicologist. Do you have any specific expertise about the impact of the actual levels of these narcotics or alcohol substances in the blood as to whether they influence individuals' behaviors?
>
> A: With regards to alcohol, I have lots of experience with different levels of alcohol and how it can affect behavior. Regarding methamphetamine, typically either they exhibit clinical signs that confirm my measurements, but as far as a level of 330 versus 350, I couldn't give you expected changes on that. But the presence of methamphetamine plus his sort of hyperactive behavior that was report when he was being picked up would be consistent with having methamphetamine in his system.
>
> Q: Okay. So . . . With regard to morphine, similar to methamphetamine, you don't have an opinion with regard to the blood level that would be a necessary factor? You're basing it on behavior?
>
> A: Correct.
>
> Q: Okay. And with regard to his hyperactivity . . . explain to me what was his hyperactivity.
>
> A: He was talking a lot and moved a lot, very fidgety in movement a lot prior to his coming into the jail when they were picking him up was the report that I reviewed.

Vilke Depo. (Ex. L) at 104:11-105:16. Dr. Vilke testified that he has no idea when the drugs were ingested or how long they were in his system. Vilke Depo. (Ex. L) at 124:11-14. Presumably, the absence of this information is because Dr. Vilke was not qualified to offer these opinions or information.

Rather, Mr. Vilke's opinion is based on his own assessment of the rationality of Mr. Aguilar's actions and certain officers' description of Mr. Aguilar's behavior—that he was acting jittery and appeared to be under the influence—testimony which is contradicted by other officers. But the Defendants who knew Mr. Aguilar through prior contacts, and were actually qualified to assess whether someone is under the influence, testified that Mr. Aguilar did not appear to be

intoxicated or high. Officer Melero was specially trained and qualified to recognize persons under the influence of drugs and alcohol. Melero Depo. (Ex. B) at 48:17-49:20. He testified that he did not believe Mr. Aguilar was under the influence of narcotics and did not observe any red flags in Mr. Aguilar's behavior at the time he was arrested or any time before arriving at Harbor Division station. Melero Depo. (Ex. B) at 48:11-49:25. Officer Lopez, the first on the scene who knew Mr. Aguilar from prior contacts, testified that Mr. Aguilar's behavior was always the same with him—cooperative, talkative, joking around. Lopez Depo. (Ex. G) at 34:4-18, 38:16-39:7. Mr. Aguilar did not engage in aggressive behavior and Lopez did not think that he was under the influence of narcotics. Lopez Depo. (Ex. G) at 38:16-39:3.

These Defendant officers' characterization of the Decedent is corroborated by the videos of Decedent in custody, both while in the patrol car and in the station. *See* Exhibits filed with the Court in Opposition to Defendants Motion for Summary Judgment: Ex. 2 (Patrol Car Video); Ex. 11 (Booking Area Video); Ex. 12 (Watch Commander Video) (Dkt. Nos. 60-62).

### 2. Dr. Vilke Is Not Qualified to Opine on Mr. Aguilar's Toxicology or the Physiological Effects of the Substances in Mr. Aguilar's System

Mr. Vilke is not a toxicologist. Vilke Depo. (Ex. L)103:16-19. Mr. Vilke did not examine Mr. Aguilar, did not conduct the toxicology test, and did not interpret the coroner's toxicology test. Vilke Report (Ex. I) at 9-10.  A general medical degree does not give Mr. Vilke the expertise in toxicology necessary to serve as the basis for an opinion on toxicology and the effect of the drugs in Mr. Aguilar's system on his behavior. *Higgins v. Koch Development Corp.*, 997 F. Supp. 2d 924, 930 (S.D. Ind. 2014) ("[M]erely possessing a medical degree does not qualify its holder as an expert in all medical related fields."); *Jones v. Lincoln Elec. Co.*, 188 F.3d 709, 724 (7th Cir. 1999) (expert witness admitted he was "not a toxicologist and that toxicology and how certain substances are absorbed into the body were

areas that were outside of his expertise" and therefore "the underlying basis for the medical conclusions to which [he] testified . . . were rooted in medical knowledge and training which [he] did not have.").

The substance of Mr. Vilke's opinion makes clear that it is not based on any toxicology expertise and lacks any specificity about the drugs that were in Mr. Aguilar's system and what effect they may or may not have had on his behavior. His entire opinion is essentially the generic observation that "illicit drugs commonly cause people to act in irrational and often impulsive manner." Vilke Report (Ex. I) at 9-10. On its face, nothing in this opinion reflects any toxicological or relevant specialized expertise, and therefore the Court should rule that Mr. Vilke is not qualified to opine on the subject matter represented by Opinion No. 4, *i.e.*, the toxicology results from Mr. Aguilar's autopsy and what they may or may not indicate regarding his behavior prior to death.

**3. Opinion No. 4 Is Not the Proper Subject of Expert Testimony Because It Is Not Based on "Scientific, Technical, or Other Specialized Knowledge [that] Will Help the Trier of Fact."**

Dr. Vilke's Opinion No. 4 has three bases, none of which are "scientific, technical, or otherwise specialized": (1) illicit drugs cause irrational, impulsive, and agitated behavior (Vilke Report (Ex. I) at 9-10); (2) the officer's description of Mr. Aguilar as talkative and fidgety (Vilke Depo. (Ex. L) at 104:11-105:16); and (3) Dr. Vilke's own belief that Mr. Aguilar was attempting to swallow an overlarge bindle of narcotics and that this action was irrational (Vilke Report (Ex. I) at 10).

None of these bases reflect any specialized knowledge possessed by Dr. Vilke, but rather are a matter of general common knowledge and argument. In fact, with respect to the first two bases, Defendant Melero, certified under Health and Safety Code § 11550 and the Driver Apprehension Program to recognize the signs and symptoms of drug and alcohol intoxication (Melero Depo. (Ex. B) at 48:11-49:25), is substantially more of an expert than Dr. Vilke on these matters.

Dr. Vilke's conclusion that Mr. Aguilar's intoxication contributed to his death because a rational (not intoxicated) person would not have attempted to swallow the bindle and would have complied with the officer's commands is pure argument with no basis in any medical expertise of any kind. Contrary to Dr. Vilke's line of reasoning, there is no evidence that Mr. Aguilar was attempting to swallow the bindle versus hide it in his mouth. Further, it is perfectly rational (although perhaps not prudent) for a person to attempt to hide narcotics from law enforcement, whether under the influence or sober. Nothing about these particular actions by Mr. Aguilar are manifestations of drug intoxication, and the Federal Rules of Evidence do not permit an expert to be a mouthpiece for arguments within the common understanding and experience of jurors. *See United States v. Vallejo*, 237 F.3d 1008, 1019, *opinion amended on denial of reh'g*, 246 F.3d 1150 (9th Cir. 2001) ("To be admissible, expert testimony must (1) *address an issue beyond the common knowledge of the average layman*, (2) be presented by a witness having sufficient expertise, and (3) assert a reasonable opinion given the state of the pertinent art or scientific knowledge." (emphasis added)); *Hubbard v. Rite Aid Corp.*, 433 F. Supp. 2d 1150, 1160-61 (S.D. Cal. 2006) (excluding medical expert on topic of whether the conditions described in medical records substantially limited the plaintiff's daily activities under the ADA definition of disability).

The reliability prong of the *Daubert* analysis requires that proffered expert testimony be "scientific," *i.e.* grounded in methods and procedures of science, and constitute "knowledge," *i.e.* be something more than subjective belief or unsupported assumptions. *McDowell v. Brown*, 392 F.3d 1283 (11th Cir. 2004). In *McDowell*, the court held that the requirements of *Daubert* were not satisfied when the neurosurgeon in a medical malpractice case testified that the patient's condition had worsened with a delay in treatment based on a common-sense "the earlier, the better" theory within the average juror's knowledge. Although the expert provided a study in support of his opinion that concerned a delay that was twice as long of

9

the patient in the case, it did not change the fundamental basis of the expert's opinion as one within the general knowledge of the jury. Similar to the neurosurgeon's "the earlier, the better" theory in *McDowell*, Dr. Vilke's opinion that the substances Mr. Aguilar ingested caused him to be irrational and impulsive is based on Dr. Vilke's common-knowledge opinion about the nature of drugs and their effects. He is not applying any medical or scientific expertise to the issue.

Thus, Dr. Vilke's opinions that Mr. Aguilar's behavior was the result of drug intoxication and contributed to his cause of death are not based on any "scientific, technical, or other specialized knowledge" and are therefore inadmissible under Federal Rule of Evidence 702(a).

### 4. Dr. Vilke's Opinion No. 4 Is Inadmissible Because He Fails to Reliably Apply "Reliable Principles and Methods" to the Facts of This Case.

Federal Rule of Evidence 702 requires that expert testimony "is the product of reliable principles and methods" and that those principles and methods have been "reliably applied . . . to the facts of the case." Fed. R. Evid. 702(c), (d). Reliability is determined by assessing "whether the reasoning or methodology underlying the testimony is scientifically valid," whereas relevance depends upon "whether [that] reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93. "In a case involving scientific evidence, evidentiary reliability will be based upon scientific validity, which is, in turn, assessed in large part by the degree to which the theories propounded by the expert have been subjected to and survived scrutiny in the relevant scientific community." *Barabin v. AstenJohnson, Inc.*, 700 F.3d 428 (9th Cir. 2012).

Nothing in Dr. Vilke's Opinion No. 4 is the product of scientifically "reliable principles and methods." It is unsupported by any principles or methods regarding the levels of drugs in Mr. Aguilar's system, his tolerance for drugs, the timing of his ingestion of drugs or their clearance from his system, or any other specific data. Dr. Vilke's conclusory statement that doing drugs made Mr. Aguilar

10

irrational and that irrationality contributed to his death is not based in any scientific method or principles and is therefore not reliable. *See, e.g.*, *U.S. v. Scholl*, 166 F.3d 964, 971 (9th Cir. 1999) (excluding expert testimony where expert was unable to identify any support in the psychiatric literature for her position that gamblers may believe they are truthfully representing wins and losses); *Reger v. A.I. DuPont Hosp. for Children of Nemours Foundation*, 259 Fed.Appx. 499, 500 (3d Cir. 2008) (expert testimony was not admissible where it was based on subjective belief and lacked any support by citation or reference to any scientific data or tests).

Dr. Vilke's reasoning that Mr. Aguilar's attempt to swallow the bindle was irrational, and therefore the product of drug intoxication, likewise fails to reflect any scientifically reliable principles and methods. Dr. Vilke is not a psychologist or a psychiatrist. Vilke Depo. (Ex. L) at 114:1-9; 114 21-23. Dr. Vilke testified: "I don't know what was going on in his mind at the time that he did that. Correct." Vilke Depo. (Ex. L) at 114:24-115:8. Mr. Vilke's speculation about rational behavior is closing argument material, not the product of the scientific method (or Mr. Vilke's personal expertise).  It offers no scientific support for his opinion on the effects of drugs on Mr. Aguilar's behavior and thus cannot constitute appropriate expert evidence.

### 5.   Dr. Vilke's Opinion No. 4 Is Not Relevant To Any Claim or Defense At Issue in the Case and Is Therefore Inadmissible Under Federal Rules of Evidence 401/402 and 403.

In essence, Dr. Vilke's opinion is the officers described Mr. Aguilar's behavior and actions as agitated and irrational, which is consistent with him having been under the influence of drugs. Even accepting that the behavior described by the officers could be described as agitated and irrational, which Plaintiffs do not concede, the cause of the described behavior is not relevant to any issue, claim, or defense in the litigation. Whether it was due to drugs, an anxiety disorder, the stress of being arrested, or any other cause, the behavior remains the same.  It was Mr. Aguilar's behavior, not the underlying cause (unknown to the officers) that

was the basis for the Defendants' use of force in this case.  The reasonableness of that use of force would not change had Mr. Aguilar's behavior been attributable to any of these causes. Similarly, it is undisputed that Mr. Aguilar placed the bindle of narcotics in his mouth. The rationality of that decision, and whether in was influenced by drugs, make no difference to any of the issues, claims, or defenses in this litigation.

The *Daubert* Court noted that Rule 403 was an important tool to ensure proper expert testimony: "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses." *Daubert*, 509 U.S. at 595 (*quoting* Weinstein, "Rule 702 of the Federal Rules Is Sound; It Should Not Be Amended," 138 F.R.D. 631, 632 (1991)). On remand in *Daubert*, the Ninth Circuit quoted that language and observed that "[f]ederal judges must therefore exclude proffered scientific evidence under Rules 702 and 403 unless they are convinced that it speaks clearly and directly to an issue in dispute in the case, and that it will not mislead the jury." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1321 (9th Cir. 1995). Dr. Vilke's Opinion No. 4 is irrelevant and unfairly prejudicial character evidence masquerading as expert opinion. It should be excluded under Federal Rule of Evidence 401/402 and 403.

### B. Defense Expert Mark Kroll (Taser / Bioelectricity)

Mark Kroll, Defendants' Taser expert, is a "biomedical scientist with a primary specialty in bioelectricity or the interaction of electricity and the body." Kroll Report (Ex. M) at 5. He is not a medical doctor and has no toxicology expertise. Kroll Depo. (Ex. O) at 14:8-17:20, 84:5-8, 95:4. Mr. Kroll offered 12 opinions in his initial expert report and various rebuttal opinions to Plaintiffs' experts in his rebuttal report. Kroll Report (Ex. M) at 8-9; Kroll Rebuttal Report

(Ex. N) at 6-12.

This motion in limine seeks to exclude Mr. Kroll's sixth listed opinion: "6. Due to the presence of multiple analgesic drugs, Mr. Aguilar felt zero to minimal pain from the drive (contact or touch)-stuns." Kroll Report (Ex. M) at 8, 18, 19-20, 26. As with Dr. Vilke's objectionable opinion on the drugs in Mr. Aguilar's system, the issue will be moot if the Court grants Plaintiffs' Motion in Limine no. 1 and excludes the evidence on 401/402 and/or 403 grounds. In addition, Mr. Kroll's Opinion No. 6 should be excluded under Federal Rule of Evidence 702 because: (1) Dr. Kroll is not a toxicology expert or otherwise qualified to opine on the analgesic effect of the drugs in Mr. Aguilar's system; (2) the testimony is not based on sufficient facts or data; and (3) the testimony is not the product of reliable principles and methods applied reliably in this case.

### 1.    Mr. Kroll's Opinion and Purported Factual Basis

The entirety of Mr. Kroll's Opinion No. 6 is set forth in the following portions of his report:

> 6. Due to the presence of multiple analgesic drugs, Mr. Aguilar felt zero to minimal pain from the drive (contact or touch)-stuns. [Kroll Report (Ex. M) at 8, 26]
>
> Trigger Pull # 1 . . . According to the testimony of Ofc. Medina, this drive-stun was ineffective. That is consistent with the analgesic effects of the morphine, amphetamine, methamphetamine, and ethanol found in the tissues.[151-54] [Kroll Report (Ex. M) at 18]
>
> Trigger Pull # 2 . . . With a sober person, there is some control due to pain. However, with the multiple analgesics in Mr. Aguilar, there was no pain involved and hence no pain control effect. [Kroll Report (Ex. M) at 19-20]

The authorities cited by Mr. Kroll are as follows:

> 151. Colville KI, Chaplin E. Sympathomimetrics as Analgesics: Effects of Methoxamine, Methamphetamine, Metaraminol and Norephephrine. Life Scie (1962) 1964; 3:315-322.
>
> 152. Evans WO, Bergner DP. A Comparison of the Analgesic Potencies of Morphine, Pentazocine, and a Mixture of

13

Methamphetamine and Pentazocine in the Rat. J New Drugs. 1964; 4(2):82-85.

153. James MF, Duthie AM, Duffy BL, McKeag AM, Rice CP. Analgesic effect of ethyl alcohol. Br. J. Anaesth. 1978; 50(2):139-141.

154. Woodrow KM, Eltherington LG, Feeling no pain: alcohol as an analgesic. Pain. 1988; 32(2):159-163.

Kroll Report (Ex. M) at 53. These studies do not address pain in humans caused by electronic control devices (e.g., Tasers), and they do not stand for the proposition that any amount of the studied substances reduces the pain experienced by a human subject to zero or close to zero. Weisberg Decl. ¶ 3.

### 2. Mr. Kroll Is Not Qualified to Opine on Mr. Aguilar's Toxicology or the Analgesic Effects of the Substances in Mr. Aguilar's System

Mr. Kroll does not have a medical degree. Even if he did, a medical degree is not sufficient to qualify Mr. Kroll as an expert in toxicology, as set forth above with respect to Dr. Vilke. *See supra* at pp. 7-8. Defendants have provided no evidence that Mr. Kroll has any expertise in toxicology or anesthesiology, and the "qualifications" stated in his expert report reveal no training or expertise in toxicology or anesthesiology. Kroll Report (Ex. M) at 5-7, 59-63. At his deposition, Mr. Kroll admitted that "as a general matter [he is] not qualified to opine on the analgesic effect of drugs and alcohol on the human body" and does not "hold [him]self out as a toxicologist, [or] anesthesiologist." Kroll Depo. (Ex. O) at 19:18-22. He further admitted that he is not "qualified to opine on the physical mechanisms by which pain is experienced in the human body." Kroll Depo. (Ex. O) at 22:1-4.

Although Mr. Kroll claimed that he had expertise on these issues if they arise in the context of electric shocks (Kroll Depo. (Ex. O) at 19:15-21:21, 22:4-14), in multiple instances, Mr. Kroll was unable to explain the factual basis for his opinion, stating either that he simply didn't know and/or that "you would have to ask a toxicologist." Kroll Depo. (Ex. O) at 81:15; *see also id.* at 84:2-4 ("that

would be a better question for a [] toxicologist."); *id.* at 91:9-10 ("That is definitely a question for a forensic toxicologist"). Similarly, although Mr. Kroll claimed that he "ha[s] a lot of publications on the effects of interactions of drugs with electrical shocks on the human body" (Kroll Depo. (Ex. O) at 19:23-25), the only materials cited in his report are generic publications regarding the analgesic effect of drugs and alcohol generally, not in relation to electric shocks by Taser ECDs or in relation to the specific mixture of narcotics / alcohol in Mr. Aguilar's blood or the levels of narcotics / alcohol in his blood. Those publications do not establish that Mr. Aguilar, at the levels of drugs and alcohol in his system, would have felt minimal or no pain. Mr. Kroll neither cited nor produced any of his claimed supply of publications on the effects of interactions of drugs with electrical shocks on the human body, and at his deposition he could not substantiate his claim that Mr. Aguilar felt no or minimal pain from the Taser shocks, either by reference to those publications or otherwise.

Mr. Kroll's professed opinion, that the levels of substances in Mr. Aguilar's blood were sufficient to reduce his pain to zero or minimize it, requires expertise in toxicology (to know the significance of particular levels of drugs and alcohol in the system) and neurology (to understand the pain mechanisms of the body). Mr. Kroll admitted that he has no such knowledge or expertise:

Q: You are not a medical or a scientific toxicologist; is that correct?

A: That's correct.

**Q: And so you personally cannot opine that the levels of narcotics or alcohol in Mr. Aguilar's system are equivalent to or sufficient to minimize the pain experienced from a CEW[2] in relation to the studies that you've cited?**

**A: Not as I sit here this second.** But now that you've got me curious,

---

[2] The TASER device used in this case was a type of Conducted Energy Weapon (CEW) or Electronic Control Device (ECD). Both acronyms are used to refer to the category of weapons that includes the TASER X26P used by Defendant Medina.

I'm going to go to the literature and see if those analgesic effects correspond to the recreational effects. I know that's the case for alcohol because I do recall those doses were in a recreational area, and for some people recreational levels of alcohol are quite high. And I'm not sure about the other drugs.

Q: So let's focus on alcohol then. What level of alcohol was in Mr. Aguilar's bloodstream?

A: I don't recall.

Q: So how do you know that it was a level that was sufficient to minimize the effect of a CEW based on the studies that you cite?

A: We don't have – I don't have a hard number in front of me. And that opinion was based on the idea that he had a recreational level of alcohol in him. And we know from other studies that recreational levels of alcohol offer significant analgesic effects, and that's not exactly a surprise because the expression of "feeling no pain" has been around for a long time.

Q: [W]hat is the range of recreational levels of alcohol in someone's blood?

A: Well, from personal experience I can tell you that it varies a lot.

Q: Okay. So you're saying that any level of alcohol in a person's blood minimizes the effect of a CEW deployment?

A: I'm not saying that.

Q: Okay.

A: I can tell you from analyzing a lot of cases people that were drunk enough to get in trouble appear to be drunk enough to not be bothered by a CEW, unless there's a very broad probe spread which locks up the muscles.

Q: [I]n how many cases did a person have a .07 blood alcohol level and did not feel pain?

A: I don't know.

Q: In how many cases did a person have a .07 blood alcohol level and did feel pain?

A: That's basically dual of the first question, so I don't know what the cutoff is. I'm not sure that has been studied. . . .

16

Q: Are you aware that Mr. Aguilar did not attract the attention of law enforcement due to any behavior based on drug or alcohol intoxication?

. . . .

A: I think I do recall that. [H]e was arrested because he was in an area that he was forbidden to be in, if I recall correctly. . . . It wasn't really material to my opinion, but it does appear to be different from the typical case where someone is acting crazy and the police are called.

Q: And that typical case is what you were referring to in terms of the cases you reviewed where the TASER – the CEW appeared to have minimal pain effect based on the presence of narcotics or alcohol.

A: The ones that come to mind right now would fit that pattern. . . .

Kroll Depo. (Ex. O) at 84:5-88:22. Mr. Kroll used the term "recreational level" to refer to the drugs and alcohol in Mr. Aguilar's system, but he admitted that he had no basis for knowing that the drugs in Mr. Aguilar's system were at a "recreational level" and he could not even define what a "recreational level" would be.

Q: So you said that Mr. Aguilar had recreational levels in his system. What's your basis for saying that?

A: I'm not sure why somebody would take drugs, if it wasn't fun.

Q: Are you able to opine on how the level of a substance, narcotic or alcohol, reduces over time following a person's consumption of that substance?

A: That's nothing I will opine on. I happen to know the rough number for alcohol just because I have been involved in some many cases where it's come up; but no. That would be outside of my area of expertise.

Q: So you . . . know that there was some amount measured in the toxicology report of certain substances; correct?

A: Yes.

Q: But you do not know how long prior to his arrest Mr. Aguilar did or did not consume these substances; is that correct?

A: That's correct. . . . I mean, presumably, it wasn't the day before. So presumably it was the same day, but –

17

Q: Why do you say that?

A: -- we really don't know. Well, based on the clearance level of alcohol, we can – that's a pretty safe bet. Clearance rate of alcohol. Forgive me. But I don't – know. I will withdraw that answer. I really don't. If you're suggesting he had a big binge the night before and he still had this residual level, I can't refute that, and I'm not a medical toxicologist. I don't deal in the clearance rats of these drugs.

Q: And nothing about the levels in the toxicology report is the basis for your statement that he had recreational – quote, unquote, recreational levels. Is that a correct statement?

A: That's correct.

Kroll Depo. (Ex. O) at 93:19-95:11. In essence, Mr. Kroll was using the term "recreational level" unscientifically to refer to all illicit drug use, without regard for how long drugs stay in the system or the amount of drugs taken by a recreational user. He certainly was not using the term in relation to the actual levels of drugs and alcohol in Mr. Aguilar's blood.

As demonstrated in the quoted testimony above, Kroll is unqualified to offer Opinion No. 6 and has no factual basis for Opinion No. 6, and therefore it should be excluded. *Summers v. Missouri Pacific R.R. System*, 897 F. Supp. 533, 540 (E.D. Okla. 1995), *aff'd*, 132 F.3d 599 (10th Cir. 1997), ("[T]he neurophysiological evaluation of Plaintiff Summers by Dr. Susan Franks, Ph.D. should be excluded because Dr. Franks, a psychologist, is not an expert in the field of medicine or toxicology."); *Jones v. Lincoln Elec. Co*., 188 F.3d 709, 724 (7th Cir. 1999) (expert witness admitted he was "not a toxicologist and that toxicology and how certain substances are absorbed into the body were areas that were outside of his expertise" and therefore "the underlying basis for the medical conclusions to which [he] testified . . . were rooted in medical knowledge and training which [he] did not have.") Because the subject matter of Mr. Kroll's opinion on analgesics is well beyond his area of expertise, it is unreliable and therefore inadmissible under FRE 702.

18

3.    **Mr. Kroll's Opinion No. 6 Is Not Based on Sufficient Facts or Data, Much Less Reliable Principles and Methods that Were Applied Reliably to the Facts of this Case.**

Mr. Kroll's opinion on analgesics is not based off scientific reasoning or methodology and is not reliable. Mr. Kroll did not consider the levels of substances in Mr. Aguilar's bloodstream at his time of death when he formulated his opinion, but rather assumed each substance was at a "recreational level." When asked his basis for determining that the level was "recreational," he stated that "[he was] not sure why somebody would take drugs, if it wasn't fun." Kroll Depo. (Ex. O) at 93:19-23. Mr. Kroll went on to confirm that "nothing about the levels in the toxicology report is the basis" for his statement that Mr. Aguilar had "recreational levels" of substances in his system. Kroll Depo. (Ex. O) at 95:6-13.

Experts in the field of forensic toxicology would require specific scientific data and facts to form opinions on toxicology, including information on the exact substance levels in Mr. Aguilar's system, when those substances were ingested, and how those substances interacted with one another. As set forth above, Mr. Kroll confirms that he does not know any of these facts in his deposition. *See supra* at pp. 15-18. The dose-response relationship is the hallmark of toxicology, and in this case, Mr. Kroll did not have knowledge of the dosages when formulating his opinion. *See McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1240 (11th Cir. 2005) (holding that expert witness opinion on toxicity lacked necessary indicia of reliability where expert was not a toxicologist or medical doctor, offered "speculative conclusions" regarding a substance's toxicity from "questionable principles of pharmacology" and disregarded the "dose-response relationship"). Experts in the field of toxicology could not arrive at Mr. Kroll's conclusion based solely on his assumptions, and therefore his testimony should be excluded.

Reliability is determined by assessing "whether the reasoning or methodology underlying the testimony is scientifically valid," whereas relevance depends upon "whether [that] reasoning or methodology properly can be applied to

the facts in issue." *Daubert*, 509 U.S. at 592–93. "In a case involving scientific evidence, evidentiary reliability will be based upon scientific validity, which is, in turn, assessed in large part by the degree to which the theories propounded by the expert have been subjected to and survived scrutiny in the relevant scientific community." *Barabin v. AstenJohnson, Inc.*, 700 F.3d 428 (9th Cir. 2012).

Mr. Kroll did not use scientific methodology to arrive at his opinion. He was not aware of the dosage of the drugs in Mr. Aguilar's system, the levels of drugs that would result in an analgesic effect, or the degree to which the analgesic effect would reduce the pain caused by a Taser discharge. His opinion completely lacks factual and scientific foundation, and therefore should be excluded. *See, e.g.*, *U.S. v. Scholl*, 166 F.3d 964, 971 (9th Cir. 1999) (excluding expert testimony where expert was unable to identify any support in the psychiatric literature for her position that gamblers may believe they are truthfully representing wins and losses); *Reger v. A.I. DuPont Hosp. for Children of Nemours Foundation*, 259 Fed. App'x 499, 500 (3d Cir. 2008) (expert testimony was not admissible where it was based on subjective belief and lacked any support by citation or reference to any scientific data or tests); *Cabrera v. Cordis Corp.*, 134 F.3d 1418, 1423 (9th Cir. 1998) (expert physician's testimony failed the reliability requirement of FRE 702 where expert could not point to peer-reviewed articles or research supporting his position, failed to explain how he reached his conclusions and could not point to an objective source to show how he used the scientific method.).

### 4. Mr. Kroll's opinion should be excluded because the studies he cites are irrelevant to the facts of this case and would not assist a jury.

In addition to his lack of basis and knowledge of the relevant drug doses, the research and studies referenced by Mr. Kroll provide no relevant support for his opinion that Mr. Aguilar did not feel pain. When an expert relies on the studies of others, he must not exceed the limitations the authors themselves place on the study. That is, he must not draw overreaching conclusions. *McClain v. Metabolife*

20

*Int'l, Inc.,* 401 F.3d 1233, 1245-47 (11th Cir. 2005) (expert's "inclination to draw overreaching conclusions from self-limiting medical articles[] show[ed] the speculative nature of his opinions."; "[T]he courtroom is not the place for scientific guesswork, even of the inspired sort." (quoting *Rosen v. Ciba–Geigy Corp.*, 78 F.3d 316, 319 (7th Cir. 1996))).

### a.   Methamphetamine / Amphetamine

In Mr. Kroll's deposition, he testified that he had no recollection of any publication or research he had personally performed that looked at the interaction between methamphetamines or amphetamines and electric shock. 22:15-23:11. Rather, on the point of methamphetamine as an analgesic, in his expert opinion, Mr. Kroll cites a 1964 study of a mixture of Methamphetamine and Pentazocine and a 1962 study of sympathomimetics. Kroll Report (Ex. M) at 18, 53. Both of these studies were conducted on rats. *Id.*; Weisberg Decl. ¶ 4.

It is well established that extrapolating study results across species and across dose rates to answer causal questions about humans is problematic.[3] The use of dissimilar animal studies alone has been cited as grounds for the exclusion of testimony. In *Hollander v. Sandoz Pharm. Corp.*, 95 F. Supp. 2d 1230, 1239 (W.D. Okla. 2000), *aff'd in part and remanded*, 289 F.3d 1193 (10th Cir. 2002), the court

---

[3] "Animal studies have two significant disadvantages, however. First, animal study results must be extrapolated to another species-human beings-and differences in absorption, metabolism, and other factors may result in interspecies variation in responses." Michael D. Green, et al., *Reference Guide on Epidemiology,* in *Reference Manual on Scientific Evidence* 346. *See also Wade-Greaux v. Whitehall Laboratories, Inc.*, 874 F. Supp. 1441, 1483 (D.V.I. 1994), *aff'd*, 46 F.3d 1120 (3d Cir. 1994) (plaintiff alleged that primatene cold medicine taken by mother during pregnancy caused birth defect. However, there were no strong animal studies supporting this assertion); *Bell v. Swift Adhesives, Inc., a div. of Reichhold Chemicals, Inc.*, 804 F. Supp. 1577, 1580 (S.D. Ga. 1992) ("Nothing in the record persuades this Court to depart … from precedent and allow plaintiff to rely primarily upon animal studies to carry her burden on the issue of causation.").

rejected plaintiffs' experts' attempt to extrapolate from animal studies to show that a medicine caused strokes in a products liability case, citing that the studies were "too dissimilar to the facts" and the studies "involved different drugs, [and] did not test the systemic effect of the drug." *Id.* at 1238.

Here, the studies cited by Mr. Koll do not involve the same drugs or the same species as the case at bar. When asked whether the methamphetamine distributed during the studies and that found in the street are even chemically similar, Mr. Kroll stated that whether they were similar was "definitely a question for a forensic toxicologist." Mr. Kroll's testimony demonstrates that he is not an expert on the analgesic effects of drugs and cannot draw any useful comparison between Mr. Aguilar's case and the studies he cites: "I don't know if I can speak to the effect of the – any drug isolation there . . . whether or not a recreational dose is comparable to the therapeutic dose, that would be a better question for a medical toxicologist or a scientific toxicologist, for that matter." Kroll Depo. (Ex. O) at 83:13-84:4. Thus, Mr. Kroll's lack of knowledge on both the facts of the case and toxicology are not remedied by his citations.

### b.    Alcohol

Mr. Kroll cites two studies from 1978 and 1988 to relating to the analgesic effect of alcohol. Kroll Report (Ex. M) at 18, 53. However, these studies do not have any bearing on the facts in this case. Among other problems, these studies do not address the amount of pain reduction associated with different amounts of alcohol and rather address only the comparative analgesic effectiveness of alcohol with respect to other analgesics, such as morphine. Weisberg Decl. ¶ 5. Further, the studies did not involve electric shock or the use of electronic control devices (*id.*), and therefore they do not address the pain associated with the use of Tasers or other ECDs and do not establish the degree to which alcohol, at any level, minimizes the pain caused by a Taser. In other words, these studies do not provide any basis for Mr. Kroll's opinion that Mr. Aguilar did not feel pain from the Taser

22

charges.

### c.   Morphine / Heroin

Mr. Kroll similarly departs from the scientific method when opining about the analgesic effect of heroin / morphine in Mr. Aguilar's system. Mr. Kroll referenced studies where morphine is administered to patients in the "ballpark of ten milligrams," as this amount is "used as something that makes a difference for electrical shocks." Kroll Depo. (Ex. O) at 81:6-15; 82:14-83:3. Mr. Kroll stated that for "how that translates into levels in the blood, you would have to ask a toxicologist." Kroll Depo. (Ex. O) at 81:6-15. Mr. Aguilar's autopsy showed a concentration of three micrograms per milliliter in his blood. Mr. Kroll admitted having no knowledge of the significance of this concentration to the research performed with the administration of ten milligrams of morphine. As such, the research cited by Mr. Kroll does not provide any support for the opinion claimed by Mr. Kroll and demonstrates his lack of understanding of toxicology and analgesics.

Because the support Mr. Kroll provides for his opinion on analgesics is based in irrelevant and inapplicable studies, including animal studies, and not in Mr. Kroll's own knowledge and expertise or on any reliable facts, data, or scientific method, his Opinion No. 6 is irrelevant and is inadmissible.

### 5.   Mr. Kroll's Unfounded Opinions Cannot Be Cured by Further Research, in Violation of the Disclosure Requirements of Fed. R. Civ. P. 26(a)(2).

As set forth above, Mr. Kroll was unable in his deposition to provide the necessary facts or data that would support his Opinion No. 6. At several points, Mr. Kroll indicated that he would conduct further research prior to trial, in an attempt to answer the fundamental questions that he failed to investigate prior to giving a baseless opinion on whether Mr. Aguilar felt pain due to analgesics in his system. For example, when asked in his deposition whether the studies he referred to were conducted using methamphetamine that was chemically different from

methamphetamine found on the street, Mr. Kroll responded: "I mean, I can certainly read the papers, but nothing I intend to opine on. Well, I take it back. Now that you suggest it, I will read those papers in case it comes up at trial." Kroll Depo. (Ex. O) at 91:5-18. When later asked to confirm that nothing in the toxicology report was the basis for his opinion that Mr. Aguilar has recreational level of drugs in his system, Mr. Kroll replied: "That's correct. And I thank you for suggesting that because I will review that literature in case it comes up at trial." Kroll Depo. (Ex. O) at 95:6-12. When asked whether the levels of substance in Mr. Aguilar's system could be compared to the levels in the studies he cited, Mr. Kroll answered that he didn't know, "But now that you've got me curious, I'm going to the literature and see if those analgesic effects correspond to the recreational effects." Kroll Depo. (Ex. O) at 84:9-21.

Federal Rule of Civil Procedure 26(a)(2), requires that an expert report disclose: "[A] complete statement of all opinions the witness will express" as well as "the factual basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B)(i). Rule 26(e) permits a party to submit timely supplements to their Rule 26(a) disclosures. Rule 37(c) states: "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

Under Rule 37, the general rule is that failure to comply with the disclosure requirements of Rule 26(a), including the expert report disclosure requirements, results in exclusion of evidence. *Id.*, Advisory Comm. Note; *ClearOne Commc'ns, Inc. v. Biamp Sys.*, 653 F.3d 1163, 1176 (10th Cir. 2011) (exclusion is the "general rule"). Thus, "Rule 37(c)(1) gives teeth to the [expert report] requirements by forbidding the use at trial of any information required to be disclosed by Rule 26(a) that is not properly disclosed." *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001) (affirming exclusion of expert witness where party

24

disclosed expert's identity but failed to timely disclose an expert report)

The failure to timely provide the information required by Federal Rule of Civil Procedure 26(a)(2)(B), including the "bases and reasons" for an expert opinion, prejudices an opposing party. *See, e.g.*, *Yeti*, 259 F.3d at 1107 (affirming exclusion of expert because "Plaintiffs received [the late expert] report one month before they were to litigate a complex case" when they did not have enough time to prepare to depose and cross-examine the expert at trial).

Mr. Kroll has not supplemented his expert report since the time of his deposition. Weisberg Decl. ¶ 6. From Mr. Kroll's deposition, cited at length in this motion, it is clear that at the time Mr. Kroll issued his opinion, he had no factual basis at all that would support the broad statement he made that the analgesic substances in Mr. Aguilar's blood prevented him from feeling any pain. Mr. Kroll cannot cure this failure by arriving at trial with new studies and data that were not disclosed in his expert report or his deposition testimony. Such a tactic would violate the Federal Rules of Civil Procedure, requiring advance disclosure, and severely prejudice Plaintiffs who would have no adequate opportunity to prepare and respond. Accordingly, Mr. Kroll's Opinion No. 6 should be excluded for the reasons set forth in this motion with respect to Federal Rule of Evidence 702 and, to the extent that Mr. Kroll attempts to belatedly offer an actual factual or scientific basis for his testimony, for Mr. Kroll's failure to comply with the disclosure requirements of Federal Rule of Civil Procedure 26(a).

## IV.  CONCLUSION

For all of the foregoing reasons, Plaintiffs request that the Court exclude Vilke Opinion No. 4 and Kroll Opinion No. 6.

Respectfully Submitted,
Kaye, McLane, Bednarski & Litt, LLP

DATED: September 4, 2018

By:   */s/ Caitlin S. Weisberg*
Ronald O. Kaye
Caitlin S. Weisberg

25

1

Attorneys for Plaintiffs

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28